IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JIMMY S. CALTON, SR., and ) <br> JIM S. CALTON, JR., d/b/a CALTON & ) <br> CALTON, ) <br>        Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> SHRED-IT USA, INC., a foreign ) <br> corporation, ) <br>        Defendant ) | CASE NO.: 2:08-cv-00206-MHT <br> CLASS ACTION |

**DEFENDANT'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND**

### I.   INTRODUCTION

The lone issue raised by Plaintiffs' Motion to Remand is whether this putative nationwide class action, purportedly brought on behalf of "tens of thousands of customers," satisfies the jurisdictional "amount in controversy" requirement under the Class Action Fairness Act of 2005 ("CAFA"). The answer is "yes," and remand is therefore inappropriate. Plaintiffs seek to recover fuel surcharges paid by class members to Defendant Shred-it USA, Inc. ("Shred-it") over an open-ended class period and to enjoin Shred-it from continuing to impose the fuel surcharges. The Complaint and attachments, along with the Affidavit of Shred-it CFO Rod Peckham (attached hereto as Exhibit A), show that the fuel surcharges at issue will easily exceed $5 million, the jurisdictional minimum under CAFA, by the end of this calendar year alone. Thus, this Court does have subject matter jurisdiction, and Plaintiffs' Motion fails.

### II.   FACTUAL BACKGROUND

Shred-it is the world's largest mobile document destruction company. (Affidavit of Rod Peckham, ¶ 4). Shred-it has corporate operations in 50 locations throughout the United States.

(*Id.*)  In Alabama, Shred-it operates corporate branches in Birmingham, with satellite offices in Huntsville and Montgomery.  (*Id.*)  Shred-it's branch in Mobile is an independently owned and operated franchise.  (*Id.*)

Across the United States, Shred-it provides document destruction services to approximately 100,000 service locations.  (*Id.*, ¶ 5).  A customer may have multiple service locations, but customers are typically invoiced separately for each location.  (*Id*, ¶ 5; Compl., ¶ 3 (Dkt. No. 1, Ex. A)). Shred-it's customers receive shredding service on varying intervals; some receive service every day, others every month, and others more infrequently.  (Peckham Aff., ¶ 5).  Most of Shred-it's customers are subject to a standard Client Service Agreement that Shred-it implemented approximately three years ago.  (*Id.*; Compl., ¶ 5).  Although these agreements can vary in the particulars, all corporate approved Client Service Agreements like the one at issue in this case, contain a statement that the "cost of travel to and from your location" is "FREE".  (Peckham Aff., ¶ 5; Compl., ¶ 6).  Over those three years, Shred-it has implemented a corporate policy requiring its corporate branches to implement Client Service Agreements for its customers.  (Peckham Aff., ¶ 5).

When a customer contracts for Shred-it's services, the customer is provided a secure, locked console in which to place sensitive and confidential documents for shredding.  (Peckham Aff., ¶ 6; Compl., ¶ 3).  On a scheduled basis, a Shred-it customer service representative visits the customer's location, unlocks the document disposal console, removes the materials into a secure bag and then shreds the contents on-site in a mobile shredding truck.  (*Id.*)  The customer is then provided with a certificate of destruction certifying that the materials have been completely destroyed.  (*Id.*; Compl., Ex. C).

On January 1, 2008, Shred-it implemented a fuel surcharge to offset its dramatically rising fuel costs. (Peckham Aff., ¶ 7; Compl., ¶ 6). Shred-it implemented the fuel surcharge not as a cost of travel to and from a customer's location, but rather to recoup the fuel cost associated with the operation of its diesel-powered shredding equipment. (Peckham Aff., ¶ 7). The diesel-powered shredding equipment causes Shred-it's trucks to operate at significant revolutions per minute, which results in a higher consumption of fuel. (*Id.*) The fuel surcharge addresses this incremental cost of providing on-site shredding service, which has skyrocketed in recent years. (*Id.*)

As set forth in the Complaint, Shred-it's fuel surcharge is updated monthly and indexed to the U.S. Department of Energy National Average On-Highway Diesel Fuel Prices. (*Id.*, ¶ 8; Compl., ¶ 7, Ex. B). The surcharge is then added to a customer's invoice based on the total amount of that invoice. (Peckham Aff., ¶ 8; Compl., ¶ 8). The surcharge is added to each invoice, regardless of the frequency of service. (Peckham Aff., ¶ 8).

Since its implementation on January 1, 2008 to April 1, 2008, the minimum fuel surcharge per customer per invoice has fluctuated between a high of $3.90 to a low of $3.30 for invoices less than $75. (*Id.*, ¶ 9). The maximum fuel surcharge per customer per invoice has fluctuated between a high of $130 to a low of $120 for invoices over $2,000. (*Id.*) As of March 31, 2008, Shred-it has invoiced its U.S. customers $1,463,000 in fuel surcharges. (*Id.*, ¶ 10). Based on this figure, Shred-it's revenue from the fuel surcharge currently averages $487,667 on a monthly basis and is currently projected to be $5,852,004 on an annualized basis for its customers in the United States. (*Id.*)

Contrary to these figures, Plaintiffs state in their Complaint that they "do not believe . . . the amount in controversy is [] greater than five million dollars." (Compl., ¶ 12). In that regard,

Plaintiffs seek multiple forms of *unlimited* legal and equitable relief on behalf of all putative class members, which they admit number in the "tens of thousands", including: declaratory relief that the fuel surcharge violates the contractual terms; imposition of a constructive trust "for all amounts collected"; monetary damages for breach of contract; and "disgorge[ment] of all monies collected from its customers that are determined to be improper or excessive." (*Id.*, ¶ 3; at pp. 6-8).

On March 24, 2008, Shred-it filed a timely Notice of Removal (Dkt. No. 1) with this Court removing this action from the Barbour County Circuit Court based on diversity of citizenship and amount in controversy pursuant to CAFA. Plaintiffs filed their Motion to Remand (Dkt. No. 2) on April 2, 2008. Shred-it offers the following argument in response to Plaintiffs' Motion to Remand and in further support of Shred-it's basis for removal.

### III.   ARGUMENT

Plaintiffs' Motion can succeed only if this Court lacks original subject matter jurisdiction over Plaintiffs' putative nationwide class action. *See* 28 U.S.C. § 1441(a). Subject matter jurisdiction exists so long as (i) there is diversity of citizenship as defined by CAFA and (ii) the amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(2). The parties agree that diversity of citizenship exists. As for the amount in controversy, a simple calculation reveals that Plaintiffs' attempt to recover and prohibit fuel surcharges for the entire alleged nationwide class easily meets the $5 million threshold. Consequently, this Court has original jurisdiction and Plaintiffs' Motion fails.

**A.   DIVERSITY OF CITIZENSHIP EXISTS BETWEEN THE PARTIES.**

Plaintiffs tacitly concede, as they must, that the requisite diversity of citizenship is present in this case. Under CAFA's relaxed definition of diversity, all that is required is that (i) the alleged class include at least 100 members, and (ii) at least one member of the alleged class is

a citizen of a State different from any defendant. *See* 28 U.S.C. §§ 1332(d)(2)(A), 1332(d)(5). Plaintiffs are citizens of Alabama. (Compl., ¶ 1). Shred-it is a citizen of the state of Delaware with its principal place of business in Oakville, Ontario, Canada. (*Id.*, ¶ 2; Peckham Aff., ¶ 3). Thus, the CAFA diversity of citizenship requirement is satisfied.[1]

**B.   THE AMOUNT IN CONTROVERSY EXCEEDS THE CAFA JURISDICTIONAL MINIMUM.**

Likewise, this case easily meets CAFA's jurisdictional "amount in controversy" threshold of $5 million. *See* 28 U.S.C. § 1332(d)(2) ("The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs and [diversity of citizenship exists]"). This is because the fuel surcharges at issue easily exceed $5 million for this calendar year alone, and, under CAFA, all of Plaintiffs' claims concerning the surcharges must be aggregated to determine the amount in controversy. *See* 28 U.S.C. § 1332(d)(6) ("In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000[.]").

   *1.   The Disputed Fuel Surcharges Easily Exceed The Jurisdictional Minimum.*

As an initial matter, where an action concerns a contract, the defendant opposing remand is "free to introduce evidence regarding damages arising from … a contract provision." *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1215 (11th Cir. 2007), *cert. pet. filed*, Apr. 1, 2008. If the jurisdictional amount is readily deducible from documents placed before the Court, then the Court has jurisdiction. *Id.* at 1211. And, contrary to Plaintiffs' suggestion, Shred-it's burden of

---

[1] In fact, this case also satisfies even the "complete diversity" requirement that would apply in a non-CAFA case, as Plaintiffs are all residents of Alabama whereas Shred-it is not a citizen of Alabama. *See* 28 U.S.C. § 1332(a), Compl., ¶ 2; Peckham Aff. ¶ 3.

5

proof on this issue is to show the jurisdictional amount by a preponderance of the evidence. *Id.* at 1210-11.[2]

Here, by any evidentiary standard[3], it takes just a simple mathematical calculation to deduce that the amount in controversy exceeds $5 million. Plaintiffs concede that the putative class includes "tens of thousands" of Shred-it customers, and the fuel surcharge calculation table attached to the Complaint shows the fuel surcharges ranging from $3.90 to as much as $130.00 *per invoice*. (Compl., ¶ 3; Ex. B). As shown in the attached Affidavit of Shred-it CFO Rod Peckham, customers receive invoices as frequently as every week. (Peckham Aff., ¶ 8.) Not surprisingly, given this background, Shred-it's revenue in the United States from the fuel surcharge at issue[4] currently averages $487,667 per month, has already totaled $1.46 million for the first quarter of this calendar year and is projected to exceed $5.8 million by the end of the year. (*Id.*, ¶ 10.) Thus, all or nearly all, of this amount derives from customers with Client Service Agreements like Plaintiffs'. (*Id.*, ¶¶ 5, 10.)

This evidence is more than sufficient to satisfy the jurisdictional threshold. Indeed, numerous recent cases have recognized jurisdiction based on similar evidentiary showings. For instance, a similar result was reached by this Court under CAFA in *Main Drug, Inc. v. Aetna U.S. Healthcare, Inc.,* 455 F. Supp. 2d 1323, 1326 (M.D. Ala. 2006) (Fuller, J.). In that putative

---

[2] Moreover, a defendant may supplement its notice of removal setting forth more specifically the grounds for removal even after the thirty-day period for removing the case has closed. *See Watson v. Nuvell Financial Svcs.*, LLC, No. 2:07-cv-639, 2008 WL 110923, *1 (M.D. Ala. Jan. 9, 2008) (Watkins, J.).

[3] Plaintiffs erroneously argue that the "legal certainty" test applies to this issue. (Pls' Brief, at p. 5) The "legal certainty" test is only applicable to situations where a plaintiff has deliberately pled an amount of damages *less than* the jurisdictional minimum. *See Lowery*, 483 F.3d 1209; *Burns v. Windsor Ins. Co.,* 31 F.3d 1092, 1095-96 (11th Cir. 1994).

[4] Plaintiffs' putative class includes all customers with written contracts that provide "the Cost of travel to and from your location will be 'FREE.'" For several years, Shred-it has had a corporate policy requiring local branches to use written contracts, and all corporate-approved written contracts include the provision that costs of travel will be free. Thus, all or nearly all, of the fuel surcharges billed by Shred-it should be covered by Plaintiffs' putative class. (Peckham Aff., ¶¶ 5, 10).

class action matter, the plaintiffs sought recovery for damages stemming from the defendant's alleged departures from an agreed-upon formula for pharmaceutical reimbursement. Utilizing figures provided by the defendant on the number of pharmacies and amount of reimbursements, coupled with the agreed-upon formula, the Court concluded that the jurisdictional amount in controversy was satisfied. *Id.; see also Kennedy v. Fleetwood Enter., Inc.,* No. 1:07-cv-728, 2007 WL 4287374, at * 3, (M.D. Ala. Dec. 5, 2007) (Fuller, J.) (using the complaint and underlying documents to calculate damages for breach of contract and disgorgement to determine the amount in controversy when it was not specified).

Analogous decisions under CAFA have been issued by courts throughout the circuit and across the country in situations where damages are not specified but readily deducible from quantifiable allegations at issue. *See, e.g., Scott v. ING Clarion Partners, Inc.,* No. CIVA 1:06CV1843, 2006 WL 3191184, at *4 (N.D. Ga. Oct. 31, 2006) (holding under CAFA that the amount in controversy was met when it could be calculated based on the alleged improper fees and the number of class members involved); *Senterfitt v. SunTrust Mortgage, Inc.,* 385 F. Supp. 2d 1377, 1382 (S.D. Ga. 2005) (under CAFA, a defendant's showing that it charged a specified fee to a specified number of customers satisfied the amount in controversy requirement); *Kaufman v. American Express Travel Related Serv. Co.,* No. 07 C 1707, 2008 WL 687224, at * 2 (N.D. Ill. Mar. 7, 2008) (under CAFA, a disputed fee multiplied by the number of cardholders specified by the defendant established the amount in controversy); *Eatinger v. BP Am. Prod. Co.,* 524 F. Supp. 2d 1342, 1346 (D. Kan. 2007) (under CAFA, disputed royalty payments multiplied by revenue established requisite amount in controversy); *Kocienda v. U-Haul Int'l Inc.,* No. 3:07CV954, 2007 WL 2572269, at * 1 (D. Conn. Sept. 4, 2007) (under CAFA, a disputed fee multiplied by the number of customers established requisite amount in controversy); *Kendrick v.*

*Standard Fire Ins. Co.,* No. 06-141, 2007 WL 1035018, at * 3 (E.D. Ky. Mar. 31, 2007) (under CAFA, disputed taxes multiplied by the number of class members showed "it could be reasonably deduced from the allegations that the aggregate amount in controversy *could* exceed $5 million.") (italics in original).

In their brief, Plaintiffs merely argue that the amount in controversy is not satisfied "based on the short time the challenged practice has been in place." (Pls' Brief, at p. 4). Of course, the amount in controversy is dictated by the class period as alleged in the Complaint, and that class period is completely open-ended. The Complaint does not state that Plaintiffs only seek damages accrued up to the time of filing the Complaint. Rather, Plaintiffs seek to recover "all amounts" and "all monies" paid to Shred-it by the putative class as fuel surcharges over an unlimited class period. (Compl., ¶¶ 9, 19). Therefore, because the fuel surcharges are readily deducible and projected to exceed $5 million in this calendar year alone – to say nothing of subsequent years covered by Plaintiffs' open-ended class period – the amount in controversy requirement is satisfied. *See, e.g., Kendrick*, 2007 WL 1035018, at *3 (denying motion to remand where "reasonable extrapolation" over the alleged class period of "approximately" five years showed that aggregate damages "could" or "more likely than not" would exceed $5 million).

In short, the plain facts here, viewed against consistent precedent from similar cases, shows that the amount of the disputed fuel surcharges for 2008 alone more than satisfy the amount in controversy. Consequently, remand is not proper and Plaintiffs' Motion should be denied.

    2. *Plaintiffs' Arguments Erroneously Assume This Is A "Naked Pleading" Case.*

In the face of the plain facts and clear law that establish jurisdiction in this Court, Plaintiffs' arguments misconstrue both the nature of this case and the pertinent authorities. Specifically, Plaintiffs incorrectly characterize this matter as a so-called "naked pleading" case, where "damages are unspecified and only the bare pleadings are available." *See Lowery*, 483 F.3d at 1210-11 (discussing "naked pleading" circumstance). But this is no such case.

The "naked pleading" circumstance may arise in certain personal injury and other tort cases, where damages are not liquidated or calculable. *See id.* at 1215 ("When a plaintiff seeks unliquidated damages and does not make a specific demand, … the factual information establishing the jurisdictional amount must come from the plaintiff."). In such cases, plaintiffs seeking to avoid federal court frequently refrain from stating a specific amount of damages or even disclaim all damages above the jurisdictional threshold. In such cases, often the only permissible or available evidence will be the complaint itself (along with any attachments), and removal at the outset of the case may be difficult if not impossible. Moreover, the Eleventh Circuit has noted that, although in such cases a "preponderance of the evidence" test applies to remand motions, the Court is "at a loss as to how to apply the preponderance burden meaningfully" because it has "no evidence before us by which to make any informed assessment of the amount in controversy." *Id.* at 1210.

Plaintiffs' Motion cites repeatedly to "naked pleading" cases – cases where damages were not specified in the complaint and were not liquidated or calculable from any contract document. *See, e.g., Lowery*, 483 F.3d at 1187 (noting allegations of unspecified damages for personal injuries, physical pain, mental anguish and the loss of use of property); *Williams v. Wal-Mart Stores, Inc.,* 534 F. Supp. 2d 1239 (M.D. Ala. 2008) (Thompson, J.) (claiming unspecified

9

damages in a slip-and-fall case does not allow for removal); *Channell v. Nutrition Distrib., LLC,* No. 2:07cv1103-MHT, 2008 WL 220934 (M.D. Ala. Jan. 25, 2008) (Thompson, J.) (claiming unspecified punitive damages does not allow for removal). But, as shown above, the "naked pleading" analysis does not apply here. To the contrary, Plaintiffs' contract-based allegations fall squarely within a separate rule – distinct from the "naked pleadings" rule – and discussed at length in *Lowery*. The rule applies for determining the jurisdictional amount in controversy when, as here, a plaintiff seeks damages that are susceptible to calculation, such as those for breach of contract:

> [On remand,] a defendant would be free to introduce evidence regarding damages arising from a source such as a contract provision whether or not the defendant received the contract from the plaintiff. In such situations, the underlying substantive law provides a rule that allows the court to determine the amount of damages. For example, in contract law, the default measure of damages is expectation damages; a court may look to the contract and determine what those damages would be. By contrast, 'where the law gives no rule, the demand of the plaintiff must furnish one.'

(quoting *McNutt v. GMAC of Ind., Inc.,* 298 U.S. 178, 182 (1936)).

Under this rule, evidence regarding the value of contract remedies should be considered, and Shred-it need only make its showing by a preponderance of the evidence. And, under this rule, Shred-it has shown that the contract remedies sought by Plaintiffs more than exceed the jurisdictional minimum.

### 3. *Plaintiffs' Equitable Claims Further Confirm That This Matter Exceeds The Jurisdictional Minimum.*

Finally, the total amount in controversy includes not only Plaintiffs' requested monetary relief but also the value of Plaintiffs' requested equitable relief. *See Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 346-47 (1977) (holding that federal courts had

subject matter jurisdiction where plaintiffs sought injunctive relief and the value of that relief exceeded jurisdictional minimum).  The monetary relief and injunctive relief must be both (i) aggregated across all putative class members and then (ii) combined together to arrive at the total amount in controversy.  28 U.S.C. § 1332(d)(6).  *See Hardy v. Jim Walter Homes, Inc.,* No. 06-0687-WS-B, 2007 WL 1889896, at * 4 (S.D. Ala. June 28, 2007) (citing *Exxon Mobil Corp. v. Allapattah Serv., Inc.*, 545 U.S. 546, 585 (2005) ("in determining whether the amount-in-controversy requirement has been satisfied, a single plaintiff may aggregate two or more claims against a single defendant, even if the claims are unrelated")); *Berry v. American Express Publishing Corp.*, 381 F. Supp. 2d 1118, 1123 (C.D. Cal. 2005) (noting that CAFA allows aggregation of both damages and injunction claims), *abrogated on other grounds by Abrego Abrego v. Dow Chem Co.*, 443 F.3d 676, 685 (9th Cir. 2006).  *See also Clark v. State Farm Mut. Auto. Ins. Co.*, 473 F.3d 708, 711 (7th Cir. 2007) ("It is well settled that ... an individual plaintiff's multiple claims against a single defendant may be aggregated to determine diversity jurisdiction"); *Colavito v. New York Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006) ("Different state claims brought by a single plaintiff may be aggregated for purposes of satisfying the amount-in-controversy requirement."); *Klepper v. First American Bank*, 916 F.2d 337, 341 (6th Cir. 1990) ("It is well established that claims can be aggregated to satisfy the jurisdictional amount requirement.")).

     Plaintiffs seek, among other things, a permanent injunction prohibiting the imposition of the disputed fuel surcharge.  Combining Plaintiffs' injunction request – which would bar the fuel surcharge for customers under contract beyond 2008 – further confirms that the amount in controversy easily meets this Court's jurisdictional minimum such that remand is not appropriate.

## IV. CONCLUSION

Based on the foregoing and all of the records and pleadings in this matter, Defendant Shred-it USA, Inc. respectfully requests that this Court deny Plaintiffs' Motion to Remand.

Dated: April 18, 2008.

s/ *Gregory G. Pinski*
_____
Gregory G. Pinski (MT Bar #5254, MN #296399)
(Admitted Pro Hac Vice)
Attorney for Defendant
CONNER & PINSKI, PLLP
P.O. Box 3028
520 Third Avenue North
Great Falls, MT 59403-3028
Telephone: (406) 727-3550
Facsimile: (406) 727-1640
gregorypinski@csplawfirm.com

Jeffrey A. Lee
Attorney for Defendant
MAYNARD, COOPER & GALE, PC
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, AL 35203
Telephone: (205) 254-1987
Facsimile: (205) 254-1999
jlee@maynardcooper.com

**CERTIFICATE OF SERVICE**

      This is to certify that on April 18, 2008, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/EDF system, which automatically notifies the following counsel:

Charles A. McCallum, III
R. Brent Irby
McCallum, Hoaglund, Cook & Irby, LLP
905 Montgomery Highway
Suite 201
Vestavia Hills, AL 35216

Walter B. Calton, LLC
312 E. Broad Street
P.O. Box 696
Eufaula, AL 36072

                                                               s/ *Gregory G. Pinski*

                                                               COUNSEL FOR DEFENDANT

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JIMMY S. CALTON, SR., and<br>JIM S. CALTON, JR., d/b/a CALTON &<br>CALTON,<br>　　　　Plaintiffs,<br><br>v.<br><br>SHRED-IT USA, INC., a foreign<br>corporation,<br>　　　　Defendant | )<br>)<br>)<br>)　　CASE NO.: 2:08-cv-00206-MHT<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

**AFFIDAVIT OF ROD PECKHAM IN OPPOSITION TO
PLAINTIFFS' MOTION TO REMAND**

---

PROVINCE OF ONTARIO　)
　　　　　　　　　　　　) ss:
CITY OF OAKVILLE　　　)

　　Before me, the undersigned authority, personally appeared ROD PECKHAM, who is being known to me and having been duly sworn by me, on oath deposes and says:

　　1.　I am of sound mind and understand the taking of an oath. I have personal knowledge of every statement made in this Affidavit, all of which are true and correct. I am over the age of nineteen (19), and I am fully competent and authorized to testify to the matter herein.

　　2.　I am the Chief Financial Officer of Shred-it USA, Inc. ("Shred-it"). Among other duties, I am primarily responsible for overseeing all aspects of Shred-it's accounting practices, including the preparation and approval of budgets, financial reports, financial strategies, planning and forecasts, along with tax and audit responsibilities.

1

EXHIBIT A-1

3.      Shred-it USA, Inc. is a Delaware corporation with its principal place of business in Oakville, Ontario, Canada.

4.      Shred-it is the world's largest mobile document destruction company. Shred-it has corporate operations in 50 locations throughout the United States. In Alabama, Shred-it operates a corporate branch in Birmingham with satellite offices in Huntsville and Montgomery. Shred-it's branch in Mobile is an independently owned and operated franchise.

5.      Across the United States, Shred-it provides document destruction services to approximately 100,000 service locations. A customer might have multiple service locations, but customers are typically invoiced separately for each location. These customers receive shredding service on varying intervals; some receive service every day, others every month, and others more infrequently. For approximately the last three years, Shred-it has utilized a written Client Service Agreement. Although these agreements can vary in the particulars, all corporate approved Client Service Agreements like the one at issue in this case, contain a statement that the "cost of travel to and from your location" is "FREE". Over those three years, Shred-it has implemented a corporate policy requiring its corporate branches to implement Client Service Agreements for its customers.

6.      When a customer contracts for Shred-it's services, the customer is provided a secure, locked console in which to place sensitive and confidential documents for shredding. On a scheduled basis, a Shred-it customer service representative visits the customer's location, unlocks the document disposal console, removes the materials into a secure bag and then shreds the contents on-site in a mobile shredding truck. The customer is then provided with a certificate of destruction certifying that the materials have been completely destroyed.

EXHIBIT A-2

7. On January 1, 2008, Shred-it implemented a fuel surcharge to offset its dramatically rising fuel costs. Shred-it implemented the fuel surcharge not as a cost of travel to and from a customer's location, but rather to recoup the fuel cost associated with the operation of its diesel-powered shredding equipment. The diesel-powered shredding equipment causes Shred-it's trucks to operate at significant revolutions per minute, which results in a higher consumption of fuel. The fuel surcharge addresses this incremental cost of providing on-site shredding service, which has skyrocketed in recent years.

8. The amount of Shred-it's fuel surcharge is updated monthly and indexed to the U.S. Department of Energy National Average On-Highway Diesel Fuel Prices. The surcharge is then added to a customer's invoice based on the total amount of that invoice. The surcharge is added to each invoice, regardless of the frequency of service.

9. Since Shred-it implemented the fuel surcharge on January 1, 2008 to April 1, 2008, the minimum fuel surcharge per customer per invoice has fluctuated between a high of $3.90 to a low of $3.30 for invoices less than $75. The maximum fuel surcharge per customer per invoice has fluctuated between a high of $130 to a low of $120 for invoices over $2,000.

10. As of March 31, 2008, Shred-it has invoiced its U.S. corporate branch customers $1,463,000 in fuel surcharges. Based on this figure, Shred-it's revenue from the fuel surcharge currently averages $487,667 on a monthly basis and is currently projected to be $5,852,004 on an annualized basis for its customers in the United States. All or nearly all of the fuel surcharges billed to date are derived from the CSA similar to that signed by the named plaintiffs in this case.

EXHIBIT A-3

Dated: April 18, 2008.

*Rod Peckham*
ROD PECKHAM

PROVINCE OF ONTARIO  )
                     ) ss:
CITY OF OAKVILLE     )

I, the undersigned, a notary public in and for said province, hereby certify that Rod Peckham, whose name is signed to the foregoing instrument and is known to me, acknowledged before me on this date that, being informed of the contents of the instrument and attesting to the veracity thereof, he executed the same voluntarily the same bears date.

Given under my hand and official seal this 18 day of April 2008

NOTARY PUBLIC
My commission expires    N/A

MICHAEL T. GARVEY

4

EXHIBIT A-4